**ALEXANDER v CRON, Admr et**

Ohio Appeals, 2nd Dist, Miami Co

No 276.    Decided Jan 6, 1932

Losh O. Harbaugh, Piqua, and Berry & McCullouch, Piqua, for plaintiff.

A. W. DeWeese, Piqua, John F. Maher, Greenville, William H. Gilbert, Troy, and Gilbert & Haines, Troy, for defendant.

HORNBECK, J.

Much of the evidence is offered to support either the claim of compliance by plaintiff with her contract, as stated, or the defense of non-compliance.

The plaintiff was precluded from testifying and in consequence there is not that continuity of proof which would be expected if she were permitted to take the stand. However, it is testified, and not denied, that plaintiff was with Emeline for weeks before she was taken to the hospital when she and Marcia were sick at the same time; that she quit her job to do this work. No record evidence from the factory at which she worked is offered to dispute this specific claim. Marcia was in bed when Emeline died and for nine or ten weeks after. It is also in proof that plaintiff assisted in preparing the body of Emeline for burial and went with Wallace to buy her clothing.

It is not the claim of plaintiff that she stayed in the Colby home continuously nor that she agreed so to do, but that she helped in care and attention to Emeline during the major part of her sickness and likewise with Marcia; that she assisted at times in the work about the house working at the factory and in her own home during the day and going to Colby's at night; that she sewed, at times washed and ironed, baked and cooked at her home for the Colbys; that she carried food to them at times, that she shopped for them and was subject to their call. There is support for all of these claims in the record as to some of them from persons unrelated to the parties.

There is testimony to the effect that when the witnesses were at the Colby home they did not see the plaintiff there. Most of these witnesses were infrequent visitors, and did not fix definitely when nor how often they were at the Colby home. Despite the generality of their statements several of them admitted that the plaintiff was there when they called. There is considerable in the record showing that the house was unkempt and dirt and dust had accumulated, a condition not unusual with old furniture though given considerable care. A washerwoman who stated she had been employed regularly once every two or three weeks for several years said that she had not seen plaintiff at the Colbys.

This testimony intended to disprove compliance with the contract upon which plaintiff relies is of little force or effect, because it conclusively appears that Mr. Colby was well satisfied with the services which plaintiff was performing for him and his sisters. Every witness who says anything on the subject, including those who were not of the family of plaintiff, and at least one of the witnesses for the defense, is to the effect that Mr. Colby on many occasions had commented with much favor and complete satisfaction upon the manner in which the plaintiff was looking after his sisters and assisting him in his home.

The proof of the contract under which plaintiff was working, it is true, comes from her husband and her family but it is definite and the only form of denial is by negative evidence, viz; persons to whom Colby had talked about making a will or about his property who would be asked if he had ever said to them that he had a contract with plaintiff to which they all replied that

he had said nothing.

The defense has urged that all three of the Colbys went to the hospital and died there. This is true but it was only the last few weeks of their lives that they were removed to the hospital. Emeline was there twenty days, Marcia ten and Wallace thirty-three.

The services of the plaintiff covered 10 years and began when all three of the Colbys were living. Emeline suffered a long spell of sickness through which it is testified the plaintiff assisted at the house and in her care. Marcia was sickly continuously during the 10 years before and after Emeline's death and lived eight years after Emeline.

It is obvious that these old people needed attention outside of their own group. It is significant that, although there is considerable testimony offered to contradict the claim of plaintiff touching the extent of her services to the Colbys during the 10 years that she helped them, nowhere in the record is there the name of one person, other than the family, outside the colored washerwoman, who ever assisted in the slightest degree in any menial task about the Colby home. Then, too, at the death of Marcia and of Wallace Colby, it is established that the plaintiff was with their bodies, assisted in their preparation for burial and helped in the necessary work to be done at such a time. It is testified by the undertaker that the plaintiff was in practical charge during the period between the death and burial of Wallace Colby. The Colbys clearly constituted a reserved and eccentric family. They had no close relatives and no intimates among any of their kin. It is established that Mr. Colby did not want the Colbys to succeed to any of his estate. The plaintiff was related to him distantly although almost as closely as the others of his heirs. When the three who had lived together enjoying their possessions alone recognized that their last years would bring need of help, it was most natural for them to arrange to compensate the plaintiff whose work pleased them by paying her for her services with the property when the last one of them was through with it. There is no evidence that plaintiff received any money for her services through the years. It is probable that if Mr. Colby had paid her anything it would be found in his diary as it appears that he put down the cost of a meal that he ate at a restaurant on December 27, 1928.

But there are three monumental facts in this record, unusual and convincing of plaintiff's claim. (1) The entry in the diary of Wallace Colby of date December 27, 1928. (2) The delivery of the key to the Colby home to plaintiff. (3) The assertion of ownership by plaintiff.

There is nothing to cast the slightest doubt on the correctness and authenticity of the record in the diary in the handwriting of Mr. Colby dated December 27, 1928 and made, no doubt, contemporaneously with the act recorded.

The entry reads:

"Thursday, 27, rained some last night. I did not get up until 10 A. M. I got dinner at rest. 30. **I made my will to Ida Alexander and Ralph Roeth.** I sent New Year's cards J. W. Hercules, Cure, Jordan, Ida, Helen, Verese, Verda, Buzzard, Ada, Case."

This is conclusive not only that he made a will but that Ida Alexander was his beneficiary. That the will was made pursuant to his contract with plaintiff is the most reasonable explanation to be found on the record. It is also probable that according to his diary he had willed a farm which he owned on December 27, 1928, to Ralph Roeth. Roeth testifies that Colby told him when he bought the farm and made the first payment that he would not have to make the last payment which was not due for 10 years; that he would get the farm whether he bought it or not.

Some testimony was offered originally in this court tending to show that one of counsel for defendant, Cron, Administrator, drew Mr. Colby's will. This is denied. Though satisfied that the will was made we are content to take the statement of counsel that he did not draw it and that it was never in his possession.

Mr. Colby fell and injured himself, was taken to his home, sent for an ambulance and was removed to the hospital. Before going he said to Mr. Cron (page 25 of the record):

"You lock the back doors." I says, "Shall I turn out the gas," and he says "Yes," and he said to lock the front door. He wasn't able to move. We locked up the house and took him to the hospital, and he said, "Now, you take this key to Mrs. Alexander" and he told me the location; I think it was Manning Street; and he says, "You tell them that I have gone to the hospital." And he said, "They always offered to do anything for me that they could do, and you tell them I have gone to the hospital."

Mr. Cron gave the key to his brother with instructions to deliver it to Mrs. Alexander. Upon receipt of the key she and her husband immediately went to the hospital and arrived there before Mr. Colby had been assigned a room. When they saw him it is testified by Mr. Alexander, page 16:

"We went out to the hospital there, and we had to wait pretty near an hour before we got in. They was giving him a bath. And finally the nurse came to us and told us we could see Mr. Colby. She told us what room he was in and we went and opened the door and when we got in we shut the door and he shook hands with Ida and asked if she had received the key to her home. Ida says "Yes," that she had received it from Mr. Cron. He says, "That key is to your home; that home is yours with all that is in it; take it and take care of it.

Q. And she took the key. A. She had the key. And then he turned to me and says, "George you have been kicking about writings; now I am going to show you I am a man of my word; I am going to give Ida possession of her home before I die, according to my contract and my will, as I know I won't get well, and Ida has fulfilled her agreement and companionship to me and I want her to have that home with all that is in it. Then he said about Mrs. Miller. Mrs. Miller was to move her fence on the line. And he had got paid for a dead man on the back of the lot, etc."

It will be observed that, although suspicion is directed toward the testimony of Mr. Alexander because the statements ascribed to Mr. Colby were made to the Alexanders only, it must be borne in mind that the key came into the possession of plaintiff through a third person and upon the express direction of Mr. Colby. There are but two plausible theories upon which the key would have been sent to the plaintiff at the time and under the circumstances. (1) That she was to enter the house for the purpose of doing some work there for Mr. Colby. This is not tenable because it does not appear that she was ever before given the key or that it was then necessary to do any work at the Colby home. The other theory, is as the plaintiff claims, that the key was given to her to evidence possession and in furtherance of his expressed purpose to put her in possession in compliance with his contract with her.

The testimony of Mr. Alexander dovetails with the claim of plaintiff and is the most reasonable view of the facts in the light of the evidence.

(3) Finally, the plaintiff by conduct supports the theory of her suit. Upon the death of Mr. Colby she enters his former home, takes possession, cleans and washes articles in the house, takes some away for the purpose of renovation, orders the gas meter changed into her own name and generally deports herself as the owner of the house and its contents. These acts continue until by injunctive process she is ordered to return all that she had taken from the house and to desist from other acts of ownership. We do not believe the plaintiff would have had the temerity to assert ownership to the property, in the open manner which she did, if not supported by the assurance implanted by the facts appearing in the record.

It is urged that the statute of frauds prevents relief to the plaintiff. As we view the case the statute has no application for the reason that complete performance of the terms of a contract takes it out of the operation of the statute.

In **Wilbur v Paine, 1 Ohio 256**, it is said:

"It has frequently been held, on the circuit, that the delivery of possession, on a parol agreement, was sufficient to take it out of the statute, and we see no reason to reverse the rule, or to reject the principle upon which it is founded. When the existence of a contract is evidenced by a change of possession, which must result from the joint act of the parties, the mischief intended to be remedied by the statute is scarcely to be apprehended. The fact, as far as it goes, is as satisfactory evidence of the existence of a contract as a memorandum in writing could be, and it may be added, that under such circumstances, to enforce the statute, and leave the party who has been put into possession, by virtue of an agreement, to be treated as a wrong doer, would not only be repugnant to justice, but would make the statute a shield and protection for injustice."

We then conclude by force of the clear and convincing effect of the testimony as we analyze it and weigh it, that the plaintiff has proven her contract, as alleged, that compliance therewith was made to the satisfaction of Wallace Colby, which is sufficient and that he accelerated the time within which he would have been required, in observance of the terms of the contract,

to give the property and its contents to plaintiff by will, by transferring it to her by express terms accompanied with the evidence of possession, the key. That by his final act, the contract became an executed agreement the terms of which had been fully met by both parties.

A defense of res adjudicata is asserted by defendants based upon the injunction suit instituted by defendant, Administrator, against Ida Alexander, the plaintiff in this suit, No. 25352, Miami County Common Pleas Court.

This action was instituted after the instant case was begun, as disclosed by the petition, with no purpose to interfere with the ultimate determination of the question here presented, viz; whether or not the plaintiff should be decreed to be the owner of the real and personal property mentioned in the petition. It was an interim suit clearly instituted for temporary relief. The prayer of the petition removes any doubt as to the purpose of the action. When this case is determined that case will have served its purpose, viz; to prevent any acts of ownership by plaintiff over the personal property the ownership of which is in controversy here.

But the final entry which was spread upon the record in the injunction suit, dated June 1, following the overruling of the motion for a new trial and notice of appeal in the instant case, of date May 25, 1931, grants an injunction perpetually enjoining the plaintiff from,

"Disposing or removing the household goods or chattels of said decedent, Wallace Colby, from the homestead on North Main St., Piqua, Ohio, and from ever interfering with them and ordering her to return all articles taken therefrom."

From an examination of the pleadings, as is necessary in determining the merit of a defense of res adjudicata, it appears that the petition sets forth no allegation upon which a judgment for perpetual injunction, prior to a final determination of the instant suit could be based. The answer of Ida Alexander affirmatively avers ownership of the personal property to be in her, but to this answer no reply is filed.

Note the language of the petition:

"That this plaintiff is entitled to the possession of said property unless said defendant in said action sustains the allegations of her petition. This plaintiff has no legal remedy at law to obtain possession of these goods and only asks that said defendant be restrained from disposing of any of said articles of personal property until the rights of the parties thereto have been determined as to who is entitled to the lawful possession thereof."

The injunction suit was only an incident to this suit, was not intended in any way to affect its orderly consideration and determination. It had not been finally determined when the perpetual injunction was granted. We hold that res adjudicata is not established as claimed by the defense.

We, therefore, conclude that perpetually restraining Ida Alexander from claiming or asserting any right of ownership to the personal property in question was when the judgment was entered, beyond any relief that could have been granted to the plaintiff in the injunction suit, and to the extent that it was beyond relief that could be properly granted it should not be binding in the instant case.

The prayer of plaintiff's petition will be granted, and she will be decreed to be the owner of the real estate and personal property described in the petition, and judgment may be entered which will effectively accomplish the relief sought in her petition.

ALLREAD, PJ, and KUNKLE, J, concur.

## DECISION

Rendered April 26, 1932

HORNBECK, J.

Since the determination of this case it is made to appear by amendment to answers of the administrator and heirs at law of Wallace Colby, deceased that there are certain taxes, special assessments and two mortgages which now stand as liens on the premises, the subject matter of the action. All of these liens were placed upon the real estate subsequent to the inception of the contract which this court found to have been made between Ida Alexander and Wallace Colby in his lifetime and under which contract the property was delivered to Ida Alexander. The record supports the claim of Ida Alexander that she was to have this property free and clear of incumbrances. To require it to bear the burden which now rests upon it as liens would work complete annulment of any beneficial effect of the contract by which

she was to have the real estate. There is ample personal property of decedents from which the payment of the liens may be made. The debts which they secure were all the personal obligations of Mr. Colby. It is but equitable and the record supports an order that the administrator pay the special assessments in full and the notes secured by the real estate mortgages in full, with interest, and the general taxes which were a lien at the time of the transfer of the real estate to Ida Alexander, viz: the day Mr. Colby delivered the key to her at the hospital. Ida Alexander will be entitled to the net income from the real estate from the date when she was enttiled to possession, namely, the date of the delivery of the property to her.

It will be so ordered.

ALLREAD, PJ, and KUNKLE, J, concur.